# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KAY BEER DISTRIBUTING, INC.,

          Plaintiff,

     v.                                     Case No. 07-C-1068

ENERGY BRANDS, INC.,
CADBURY SCHWEPPES BOTTLING
GROUP, INC., and
THE AMERICAN BOTTLING COMPANY[1]

          Defendants.

---

## DECISION AND ORDER

---

      Kay Beer Distributing, Inc. ("Kay"), a distributor of beer and non-alcoholic beverages, sued Energy Brands, Inc. ("Energy Brands"), Cadbury Schweppes Bottling Group, Inc. ("Cadbury") and The American Bottling Company[1] (collectively "the defendants") in state court asserting a claim under Wisconsin's Fair Dealership Law, Wis. Stat. § 135.01 *et seq*., ("WFDL"). Based on federal diversity jurisdiction, 28 U.S.C. § 1332, the defendants removed the case to this Court. Kay thereafter amended its complaint to add claims for breach of contract, unjust enrichment and promissory estoppel, breach of fiduciary duty and civil conspiracy in violation of Wis. Stat. § 134.01. Before me now are four motions: (1) the defendants' motion for summary judgment; (2) the defendants' motion for a protective order; (3) Kay's motion to stay defendants' motion for summary judgment; and (4) Kay's motion to compel discovery. For the reasons set forth below, Kay's motions for a stay and to compel discovery will be denied, and defendants' motion for a

---

[1]Defendant The American Bottling Company was Cadbury's local distributor and has been treated by the parties in their briefs as part of Cadbury.

protective order will be granted. The defendants' motion for summary judgment will also be granted as to all claims, except Kay's claim for breach of contract against Energy Brands.

## BACKGROUND

Kay alleges that in early 2002 it entered into a joint venture and exclusive dealership agreement with Energy Brands to serve as the exclusive dealer for a line of enhanced water drinks, The Glacéau Brands, in the Fox Valley area and northeast Wisconsin. The Glacéau Brands drinks consist of "vapor distilled, deionized, and/or reverse osmosis water, crystalline fructose as a sweetener, citric acid, electrolytes, natural flavors and vitamins, including Vitamin C, B3, B5, B6, B12, and E." (Am. Compl. ¶ 9.) Kay claims that the agreement, which was not reduced to writing, was a simple one under which Kay would take on Glacéau products in exchange for an exclusive right to distribute them in its territory. (Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Br.") at 2.) Kay asserts that the agreement was that the distributorship would continue as long as Kay worked in good faith and increased sales and distribution of brands. The defendants, on the other hand, contend that the oral agreement was terminable at will. (DPFOF ¶ 10; Pl.'s Br. at 27.)

In any event, Kay began selling the Glacéau brands shortly thereafter. Although sales increased over time, the Glacéau line of products never constituted more than a small percentage of Kay's revenues and profits. These products accounted for .42% of Kay's total sales in 2004, .46% of its total sales in 2005, .88% of its sales in 2006 and 3.18% of its sales in 2007. (DPFOF ¶ 31.) The percentage of Kay's profits attributable to sales of the Glacéau products over this time frame is similar, with .39% for 2004, .48% for 2005, .85% for 2006 and 2.64% for 2007. (*Id.*) In actual numbers, Kay's profits from sales of Glacéau products ranged from $14,751 in 2004 to $119,433 in 2007. (*Id.*)

2

Sometime in late 2004 or early 2005, Energy Brands entered into a distribution agreement with Cadbury (actually, Cadbury's predecessor-in-interest) under which Cadbury became the exclusive distributor of Glacéau products in six Midwestern States and parts of Michigan and Wisconsin, including a portion of Kay's territory. (Pl.'s Additional PFOF ¶ 11.) On April 4, 2005, Kay and Energy Brands signed an Agreement and General Release (the "Release") under which Kay was paid $8,500 by Energy Brands. The Release reads as follows:

### AGREEMENT AND GENERAL RELEASE

1. The undersigned, KAY DISTRIBUTING ("Kay") hereby acknowledges and agrees that: (i) the distribution relationship by and between Energy Brands Inc. ("EBI") and Kay is terminated as of the date hereof, and (ii) except as set forth in paragraph 2 below, no amounts of any nature are due to Kay. In exchange for the valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Kay hereby agrees that it shall not take any action that would harm the reputation of EBI or its products or take any actions that would be disruptive to the transfer of territory to EBI's new distributor or the distribution of EBI's products.

2. KNOW ALL MEN BY THERE PRESENTS THAT, for Eight Thousand Five Hundred and 00/100 Dollars ($8,500.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Kay, on behalf of itself and each of its officers, directors, shareholders, employees, agents, and affiliates (collectively, "Releasor") hereby releases and forever discharges EBI, and its officers, directors, shareholders, agents, distributors, employees, successors, and assigns (collectively, "Releasees") from and against any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, whether in law or in equity, which the Releasor and its successors and assigns, may now or hereafter have against the Releasees for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of this General Release.

This Agreement and General Release may not be changed orally and shall be governed by the law of the State of New York.

(Aff. of Michael Perez, Ex. A.)

3

Despite its broad terms, Kay contends that the Release was intended to acknowledge Energy Brands's transfer of only a portion of Kay's territory to Cadbury and to release Energy Brands from any and all liability arising out of such transfer. (Pl.'s Reply to DPFOF at 7; Pl.'s Additional PFOF ¶¶ 24-25.) The defendants, on the other hand, contend that the Release was intended to terminate the entire distributor relationship between Kay and Energy Brands as of April 4, 2005, and that after that date Kay no longer purchased Glacéau products from Energy Brands. (DPFOF ¶¶ 15-17.)

The accounts of what did, or did not, happen between the parties after the effective date of the Release, or at least their respective views of the significance of those events, vary significantly. Kay claims it continued to deal directly with Energy Brands after the Release up until its distributorship was terminated by Energy Brands in November 2007. (Pl.'s Additional PFOF ¶ 26.) Kay notes that after the Release it did orally agree to purchase through Cadbury and Cadbury orally acquiesced in the agreement to supply Kay. (*Id.*) Kay maintains that Energy Brands acted as if the distribution agreement still existed by policing boundary disputes between Kay and Cadbury, instructing Kay concerning promotions, sharing the cost of promotions with Kay and instructing Kay on pricing. (Pl.'s Additional PFOF ¶¶ 22-23.) Further, Kay claims that Energy Brands could have terminated the agreement if Kay failed to keep current on payments that were due Energy Brands for product or on credit Energy Brands had extended to Kay. (Pl.'s Additional PFOF ¶ 30.) In the defendants' view, Kay no longer purchased Glacéau products through Energy Brands after the Release terminated the distributorship, though Kay did continue to have access to the products through Cadbury as a sub-distributor for the area of Brown, Kewaunee and Door Counties. (DPFOF ¶¶ 17-18; Defs.' Resp. to Pl.'s Additional PFOF at 8.)

4

On June 7, 2007, The Coca-Cola Company ("Coke") acquired Energy Brands for approximately $4.1 billion, $200 million of which was allocated for anticipated liability incurred for terminating existing Glacéau distribution agreements. (PPFOF ¶¶ 35, 38.) As part of the transaction, effective November 2, 2007, Energy Brands terminated its distribution agreement with Cadbury upon payment of some $93 million. (PPFOF ¶ 23, 41.) Kay, which was no longer able to purchase Glacéau products from Cadbury, received nothing. Convinced that it had contributed to Energy Brands' success and that it was therefore entitled to a portion of the proceeds, Kay commenced this action.

The defendants have moved for summary judgment as to each of Kay's claims. They first contend that Kay's claims against Energy Brands are barred by the Release Kay signed in 2005. Alternatively, the defendants argue that Kay's WFDL claim against Energy Brands fails because Kay was not a dealer within the meaning of the WFDL. Additionally, the defendants argue that any claim Kay has under the WFDL is barred by the one-year statute of limitations and that Energy Brands had good cause to terminate its relationship with Kay in any event. Kay's contract claim fails even aside from the Release, the defendants argue, because its original agreement with Energy Brands was terminable at will, and thus there was no breach. To the extent the agreement was not terminable at will, the defendants argue that it is void under the statute of frauds, since it was not in writing and could not be performed within one year. Kay's claim for unjust enrichment fails, the defendants argue, because Kay failed to confer the kind of benefit on the defendants that is needed to support such a claim. The breach of fiduciary duty claim fails, defendants contend, because their was no joint venture between the parties out of which such a duty could arise. Finally, Kay's claim under Wis. Stat. § 134.01 for injury to business fails, the defendants contend, because the defendants engaged in no wrongful acts and did not act with malice toward Kay.

5

Because discovery was still ongoing at the time the defendants filed their motion for summary judgment, Kay requested and was granted additional time to respond. Two months after moving for summary judgment but before Kay filed its response, however, the defendants filed a motion for a protective order seeking, *inter alia*, a stay of further discovery until the pending motion for summary judgment was decided. Kay opposed defendants' motion for a protective order and filed a motion to stay consideration of their motion for summary judgment and to compel additional discovery Kay claimed it needed to fully respond. At the same time, Kay filed its response to the defendants' motion for summary judgment.

In order to resolve the various motions, I will first set out the principles that govern the Court's consideration of a motion for summary judgment and then address Kay's motion for a stay, the defendants' motion for a protective order and Kay's motion to compel. Because I conclude that Kay does not need further discovery to respond to the defendants' motion for summary judgment, the defendants' motion for a protective order will be granted and Kay's motions for a stay and to compel discovery are denied. I will then proceed to address the merits of the defendants' motion for summary judgment.

**ANALYSIS**

**A. Principles Governing Summary Judgment**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the

6

initial burden of demonstrating that it is entitled to summary judgment. *Id*. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id*. at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id*. at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chi.*, 119 F.3d 1286, 1291 (7th Cir. 1997).

A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. Therefore, summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id*. at 322.

**B. Motions For Stay, Protective Order, and To Compel Discovery**

Fed. R. Civ. P. 56(f) allows a party opposing a motion for summary judgment that cannot present facts essential to justify its opposition to request the court to order a continuance to take

7

depositions or undertake discovery.[2]  "A party seeking the protection of Rule 56(f) must make a good faith showing that it cannot respond to the movant's affidavits." *U.S. v. All Assets and Equipment of West Side Bldg. Corp.*, 58 F.3d 1181, 1190 (7th Cir. 1995) (citation and footnote omitted).  Further, "[t]he party proceeding under Rule 56(f) must cite specific evidence that would create a genuine issue of fact and may not 'block summary judgment simply by offering generalities about the need for further discovery.'" *Taylor v. Lifetouch Nat'l School Studios, Inc.*, 2005 WL 3320779, *2 (N.D. Ind., Dec. 6, 2005) (quoting *Green v. Litscher*, 103 Fed. Appx. 24, 26 (7th Cir. 2004)); *see also Woods v. City of Chi.*, 234 F.3d 979, 990-91 (7th Cir. 2000) (finding that district court did not abuse its discretion in ruling on a motion for summary judgment before granting leave to conduct additional depositions when the plaintiff offered virtually nothing to demonstrate why the depositions he sought were likely to generate any genuine issue of material fact).

Kay responded to the defendants' motion for summary judgment and contemporaneously moved for the stay under Rule 56(f) and to compel discovery.  Kay contends that the defendants have failed to fully respond to its discovery requests, including 10 separate interrogatories and 55 separate requests to produce, and have failed to produce three witnesses defendants for depositions.  Kay claims that the additional discovery it is seeking is relevant to disputed factual issues, including:

---

[2] Rule 56(f) provides:
   **(f) When Affidavits Are Unavailable.**  If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

8

(i) whether Energy Brands committed to continue Kay as an exclusive rights distributor for so long as Kay complied with its requirements and continued to work in good faith to increase sales and distribution;
(ii) whether Kay continued in a direct relationship with Energy Brands after April 2005;
(iii) whether Energy Brands granted exclusive rights to Cadbury for Kay's territory in a 2004/ 2005 agreement between them;
(iv) whether Defendants intentionally planned to violate Kay's rights and injure its business in 2005 and/or 2007; and
(v) whether Cadbury was paid compensation for the termination of Kay's territory of distribution in 2007.

(Dec. # 55, Mot. to Stay, at ¶ 2.)  The proposed depositions Kay claims it needs are those of Energy Brands' President Michael Repole and Chief Financial Officer Michael Venuti, as well as a Rule 30(b)(6) corporate deposition of an Energy Brands representative.  The notice of the Rule 30(b)(6) deposition Kay seeks to take lists 22 topics the witness is required to testify about, several of which have multiple subparts, including one topic with 13 subparts.

It is clear from the defendants' motion for a protective order and their response to Kay's motion to compel that this is not a case in which the party opposing a motion for summary judgment has not received any discovery from the moving party and seeks relief under Rule 56(f) on that basis.  Indeed, in the view of the defendants, "[d]iscovery in this lawsuit has spiraled out of control." (Br. Supp. Prot. Order at 1.)  Kay has served the three defendants a total of 313 document requests, 52 interrogatories, and 154 requests to admit.  (McCauley Decl. at ¶ 22.)  Kay has conducted depositions of the two Energy Brands employees who were at the meeting and involved in the discussions pursuant to which Energy Brands first became a Glacéau Brands distributor, and each of the Energy Brands and Cadbury employees with whom Kay dealt over the course of the relationship.  Rule 30(b)(6) depositions of IT representatives of both Energy Brands and Cadbury have also been conducted by Kay.  (*Id.* at ¶¶24-26.)

9

Yet, Kay is not satisfied with the defendants' responses to many of its interrogatories and requests to produce. Kay claims that the defendants have not fully responded to several discovery requests and have refused to respond to others. A major area of disagreement between the parties is over whether the defendants have adequately responded to Kay's requests for electronically stored information ("ESI"). At Kay's request, Energy Brands conducted electronic searches of its email storage program which generated five DVDs containing 17 gigabytes of data consisting of 56,547 documents, comprising hundreds of thousands of pages. (*Id.* at ¶¶ 4-12.) Energy Brands contends that many of the documents are not relevant to the case in that they don't even relate to Kay Beer specifically, or Kay's name appears only in an attachment naming all dealers throughout the country. Kay has been provided all emails located in the search for the term "Kay Beer" that reference or discuss Kay Beer in the body of the email. (*Id.* ¶¶ 13-16.) Kay contends, however, that it is entitled to all ESI in which its name appears and insists that Energy Brands turn over the DVDs containing it. Energy Brands objects to turning over ESI that is either privileged or otherwise not discoverable. The defendants note that they have already expended $40,000 in attorneys fees responding to Kay's discovery demands and argue that the issues raised in their motion for summary judgment do not warrant the kind of discovery Kay is demanding.

The Court agrees. The sheer number and breadth of Kay's interrogatories and requests for production provide strong support for the defendants' contention that discovery has spiraled out of control. This is especially the case since the facts needed to support Kay's claims, at least to the extent required to avoid summary judgment, are already part of the record or necessarily within Kay's own knowledge. The defendants' contention that Kay's claims against Energy Brands are barred by the written "Agreement and General Release", for example, is based on a written

10

document that is already part of the record. Any argument by Kay that the written document is ambiguous and was not intended to terminate Kay's relationship with Energy Brands necessarily rests on the document itself and facts within Kay's own knowledge. The question of whether Kay was a dealer within the meaning of the WFDL also rests on facts known to Kay such as the percentage of income it derived from sales of Glacéau products and the amount of time, money and effort, the so-called "sunk costs", it invested in the relationship. The contract Kay claims was breached was oral and, thus, Kay itself would necessarily be aware of the oral promises it exchanged with the Energy Brands representatives that it claims formed such contract or contracts. Moreover, Kay has already deposed each of the Energy Brands employees who were involved in the transaction. Kay would also have knowledge of those facts that it claims support its allegation that it entered into a joint venture with Energy Brands such that it was owed a fiduciary duty, and it must also be aware of the specific contributions it made to the defendants such that, notwithstanding any contractual arrangement, it would be unjust for them to retain without payment to Kay. Finally, Kay's claim that it needs additional discovery to uncover potential evidence of malice needed to support its civil conspiracy claim under Wis. Stat. § 134.01 suggests nothing more than "a fishing expedition."

It may be that as to the one claim that survives, Kay will be entitled to further limited discovery. But that is no reason to require the defendants to continue incurring the expense required to respond to Kay's excessive and overly broad discovery requests. The defendants have asserted legal arguments that, if sound, undermine Kay's claims regardless of what the additional discovery Kay seeks may disclose. Kay has no right to obtain all potentially discoverable information, regardless of the time, effort and expense needed to gather it, where it is clear from facts not in

11

dispute that its claims fail as a matter of law. "The existence of a factual dispute does not necessarily preclude summary judgment unless 'the disputed fact is outcome determinative under the governing law.' *Korf v. Ball State University*, 726 F.2d 1222, 1226 (1984) (quoting *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir. 1983)). For reasons set forth above and as will further appear from the discussion of the substantive claims asserted by Kay, I conclude that none of the factual disputes Kay asserts exist are outcome determinative on any of the claims for which I will grant summary judgment. Accordingly, Kay's motions for a stay and to compel discovery are denied and the defendants' motion for a protective order is granted. I now turn to the arguments asserted by the defendants in support of their motion for summary judgment.

## C. The Release

The threshold issue as to several of Kay's claims against Energy Brands is the meaning and effect of the Release signed by Kay on April 4, 2005. The defendants claim that the Release bars all of Kay's claims against Energy Brands as of its effective date and, more importantly, the agreement acknowledges the termination of any distributorship arrangement that previously existed. The defendants concede that the Release would not bar claims against Energy Brands arising after this date. They argue, however, that because the Release terminated the business relationship between Energy Brands and Kay, no claim against Energy Brands could have arisen after its effective date. In this respect, the defendants emphasize the fact that, by Kay's own admission, Kay did not buy any Glacéau products from Energy Brands after April 4, 2005. (Defs.' Reply Br. at 2.) (citing Pl.'s Resp. Br. at 7-8). The defendants further note that Kay's claims in this case revolve around the allegation it lost the right to buy and resell the product line on November 2, 2007, and point out that this was a result of Cadbury's termination of Kay and not any action on the part of Energy Brands. Thus, the defendants argue that the Release bars all claims against Energy Brands.

12

Kay contends that the parties clearly did not intend to terminate their relationship in its entirety in 2005, but only as to the southern portion of its territory. In support of its contention, Kay notes that when it was contacted by Energy Brands representative Michael Perez in early 2005, he represented that Energy Brands intended to transfer only the Outagamie County portion of its territory to Cadbury and that Kay would remain the exclusive distributor in its remaining territory. In return for the reduction, Kay claims it agreed to accept an amount of money equal to one year of its gross profit for the lost territory. A computerized report Kay ran at the time shows its one-year profit for the territory it was giving up was approximately equal to the $8,500 Energy Brands agreed to pay pursuant to the Release. Kay also notes that after the Release was signed it continued to deal with Energy Brands directly and Energy Brands acted through emails to police the agreement under which Kay had given up a portion of its territory to Cadbury. Given the clear intent of the parties, Kay argues that the Release should be construed to apply only to the Outagamie County portion of its original territory. Alternatively, Kay argues that the parties entered a new agreement after the Release terminated the original agreement and it is that agreement that Energy Brands breached. A third alternative Kay offers is that Energy Brands falsely represented the purpose or effect of the Release and that it is therefore void and of no effect.

Both parties acknowledge what the Release itself says: that it is governed by the laws of New York. Under New York law, "[a] release is a contract, and its construction is governed by contract law". *Kaminsky v. Gamache*, 298 A.D.2d 361, 361, 751 N.Y.S.2d 254, 255 (N.Y. App. Div. 2002) (citation omitted); *see also Goode v. Drew Bldg. Supply, Inc.*, 266 A.D.2d 925, 925 (N.Y. App. Div. 1999) ("release is a contract 'whose interpretation is governed by principles of contract law'") (citation omitted). When a release is unambiguous, the intent of the parties is

13

determined by the plain language of the agreement. *Kaminsky*, 298 A.D.2d at 361; *Goode*, 266 A.D.2d at 925 ("Where the language of the release is clear, effect must be given to the intent of the parties as indicated by the language employed") (citation omitted). The question of whether an agreement is ambiguous is a question of law. *S. Rd. Assocs. v. Int'l Bus. Machines Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005); *see also Zilinskas v. Westinghouse Elec. Corp.*, 669 N.Y.S.2d 703, 705 (N.Y. App. Div. 1998) ("Whether the language set forth in a release unambiguously bars a particular claim is a question of law appropriately determined on a motion for summary judgment based upon the entire release and without reference to extrinsic evidence."). "Further, 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" *S. Rd. Assocs.*, 826 N.E.2d at 809 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (N.Y. 1990)).

Kay points to authorities interpreting New York law to hold that application of the parol evidence rule is relaxed in the context of a general release. *Mangini v. McClurg*, 249 N.E.2d 386, 389 (N.Y. 1969) ("It is true that a general release is governed by principles of contract law. There is little doubt, however, that its interpretation and limitation by the parole evidence rule are subject to special rules."); *Meil v. Syracuse Constructors, Inc.*, 247 N.Y.S.2d 541, 543 (N.Y. Sup. Ct. 1964) ("It is a well settled rule in this state that the language of a release must yield to the intention of the parties and in reference to the circumstances surrounding the situation.") (citation omitted); *Cordaro v. Lusardi*, 354 F. Supp. 1147, 1050 (S.D.N.Y. 1973) (claiming that New York has adopted the "liberal view" on the question of whether language in the release is conclusive or whether parol evidence is available to explain what the parties intended regarding the scope of a release and that "[a] general release does not always mean what it seems to say.").

14

Although New York law seems less than clear on the issue, I conclude that Kay has the better argument and that New York courts have adopted a more liberal view of the parole evidence rule as it pertains to general releases. Under New York law, extrinsic evidence may be considered to clarify the scope of a general release. *Cordaro v. Lusardi*, 354 F.Supp. at 1050. In light of New York law, I cannot say that the Release bars Kay's claims against Energy Brands. Even though the express language of the Release does not limit the territory over which Kay's distributorship was terminated, it is clear from the extrinsic evidence that the partes intended only a partial termination. Energy Brands does not dispute Kay's assertion that its conversations with Perez were limited to the Outagamie County portion of its territory, and the fact that the payment agreed upon represents Kay's one-year profit from that portion of its territory supports Kay's contention that the termination was limited to that area. The fact that Energy Brands continued to refer to Kay as a distributor thereafter and that Energy Brands actively policed the boundary between what it referred to as Kay's territory and Cadbury's territory also supports Kay's interpretation. On the other hand, the mere fact that Energy Brands required Kay to purchase from Cadbury after the release was signed does not mean that Kay was no longer an Energy Brands' distributor. Kay has presented evidence that shows even after the Release, Kay continued to take directions from Energy Brands as to promotions of its products and the territory in which it could sell. From this evidence, a jury could conclude that the agreement between Energy Brands and Kay, though altered, continued in force.

Alternatively, even if the original agreement was terminated, a jury could conclude from the evidence that Energy Brands entered into a new agreement with Kay after original arrangement was terminated. The existence of a second or successor contract is supported by evidence that Perez called Kay's non-alcoholic brands manager after the Release was signed and reassured him that

15

Energy Brands wanted Kay to remain its exclusive distributor in the territory that remained as long as Kay continued its efforts to sell its products. (Decl. of Terry Schroth ¶ 19.) Evidence of the parties conduct thereafter provides further support for this theory. Whether the original agreement continued as to the portion of the territory retained by Kay or the parties entered into a new contract, the evidence supports Kay's claim that it remained a distributor for Energy Brands after the Release. Under either interpretation, Energy Brands is not entitled to summary judgment on the ground that Kay's claims against it are barred by the Release.

**D. WFDL Claim**

Energy Brands next argues that it is entitled to summary judgment on Kay's WFDL claim because it is clear as a matter of law that Kay was not a dealer within the meaning of the WFDL. Under the WFDL, a "dealer" is "a person who is a grantee of a dealership situated in [Wisconsin]." Wis. Stat. § 135.02(2). In order to qualify as a "dealership" three requirements must be met: (1) a contract or agreement, either express or implied, whether oral or written, between two or more persons; (2) by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol; (3) in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise. Wis. Stat. § 135.02(3); *Rakowski Distributing, Inc. v. Marigold Foods, Inc.*, 193 F.3d 504, 506 (7th Cir. 1999). The parties disagree on the question of whether a community of interest existed between Kay and Energy.

"There is no bright-line test for determining whether community of interest exists." *Home Protective Services, Inc. v. ADT Security Services, Inc.*, 438 F.3d 716, 719 (7th Cir. 2006). Indeed, the totality of the circumstances test adopted by the Wisconsin Supreme Court in *Ziegler v.*

16

*Rexnord*, 139 Wis.2d 593, 407 N.W.2d 873, 879-80 (1987), which looks to two "guideposts" which, in turn, are assessed by considering ten or more "facets" of the relationship, almost invites litigation. The two primary guideposts *Ziegler* established are (1) "a continuing financial interest in their business relationship;" and (2) their "interdependence, the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* at 604-05, 407 N.W.2d 873. These guideposts are then assessed by considering a variety of "facets" or factors, including:

> how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Id.* at 606, 407 N.W.2d 879-80.

In applying the WFDL, the Seventh Circuit has distilled this dual guidepost, multi-faceted test into two crucial factors: "(1) the percentage of revenues and profits the alleged dealer derives from the grantor and (2) the amount of time and money an alleged dealer has sunk into the relationship." *Home Protective Services,* 438 F.3d at 719 (*citing Baldewein Co. v. Tri-Clover, Inc.*, 233 Wis.2d 57, 606 N.W.2d 145, 151 (2000)). However, neither of these is sufficient alone; strong facts in one area can make up for weaker facts in another area. *Id.* The "ultimate question is

17

whether the grantor has the alleged dealer 'over a barrel'–that is, whether it has such great economic power over the dealer that the dealer will be unable to negotiate with the grantor or comparison–shop with other grantors." *Id*. (citing *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 464-65 (7th Cir. 2001)).

Citing *Central Corp. v. Research Products Corp.*, 2004 WI 76, ¶ 36, 272 Wis. 2d 561, ¶36, 681 N.W.2d 178, ¶36 (Wis. 2004)), Kay argues that the question of whether there was a community of interest is one incapable of resolution on summary judgment and requires determination by a jury. (Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J. at 22.)  For this reason alone, Kay argues Energy Brands' motion for summary judgment on its WFDL claim should be denied.  Kay also argues, however, that the facts surrounding its relationship with Energy Brands would permit a jury to find that a community of interest existed.

In this Court's view, Kay reads *Central Corp.* too broadly.  It is true that in *Central Corp.*, the court concluded that summary judgment was improperly granted on the issue of whether a community of interest existed.  But there the court found that there were genuine issues of material fact, as well as reasonable alternative inferences drawn from undisputed material facts.  *Id.* at ¶ 2. When the material facts are undisputed, the community of interest question is one of law for the court.  *Home Protective Services, Inc. v. ADT Security Services, Inc.*, 348 F. Supp. 2d 1010, 1015 n.9 (E.D. Wis. 2004), *aff'd*, 438 F.3d 716 (7th Cir. 2006).  I conclude here that the material facts and the reasonable inferences to be drawn therefrom are not in dispute.

The first of the two factors the Seventh Circuit articulated calls for consideration of the revenues and sales attributable to the business relationship.  The percentage of Kay's revenues and sales of the Glacéau line of products of the from 2004 to 2007 is undisputed.  They accounted for

18

.42% of Kay's total sales in 2004, .46% of its total sales in 2005, .88% of its sales in 2006 and 3.18% of its sales in 2007. (DPFOF ¶ 31.) The percentage of Kay's profits attributable to sales of the Glacéau products over this time frame is similar, with .39% for 2004, .48% for 2005, .85% for 2006 and 2.64% for 2007. (*Id.*) Although there was a slight rise in the revenues and sales of Glacéau products in 2007, the numbers are not consistent with a finding that a community of interest existed. Indeed, according to Kay's own documents, at the time Kay lost its distributorship, Glacéau was one of 65 different beverage lines that Kay represented. (Def.'s PFOF ¶ 28.)

On the question of sunk costs, Kay has not shown that it invested any significant time, money or other resources in the Glacéau product line. Kay paid nothing for the right to become a distributor, and it has pointed to no financial investment in inventory or facilities it made in order to distribute Glacéau brands. Kay has offered no evidence as to how much money it expended advertising Glacéau products. It had no employees exclusively devoted to the Glacéau brands and offers no evidence as to the amount of time any of its employees devoted to the products. (Def.'s PFOF ¶¶ 36, 37.) Rather than offer evidence of its actual investment in Energy Brands products, Kay simply points to the fact there was a relationship of five years between Kay and Energy Brands and that Kay assisted Energy in kicking off sales of Glacéau products. But this does not support the conclusion that Kay had sunk costs in the relationship so as to warrant finding a community of interest.

The absence of evidence of sunk costs, coupled with the fact that Kay's revenues and sales of the Glacéau product line constituted a minuscule portion of its business, requires the conclusion that Energy Brands did not have Kay "over a barrel" so as to render Kay incapable of negotiating with Energy Brands or shopping for another grantor. *Home Protective Services, Inc.*, 438 F.3d at

19

719. The evidence falls far short of what would be necessary to establish a community of interest between Kay and Energy Brands. I thus conclude that Kay's relationship with Energy Brands was not a "dealership" protected by the WFDL. Defendants' motion for summary judgment on the WFDL claim will be granted.

**E. Contract Claim**

Energy Brands next argues that it is entitled to summary judgment on Kay's breach of contract claim because it is clear as a matter of law that no breach occurred. Energy Brands points out that neither in its complaint, nor in its answers to interrogatories inquiring about the specific terms of the agreement, did Kay identify a provision governing termination. Energy Brands contends that no such provision exists. Citing *Flores v. Raz*, 2002 WI App 27 ¶ 15, 250 Wis. 2d 306, ¶15, 640 N.W.2d 159, ¶15, and *Landess v. Borden*, 667 F.2d 628, 631 (7th Cir. 1981), Energy Brands notes that under Wisconsin law, "[a] contract which is silent as to its time of duration may be terminated at any time by any party upon reasonable notification to the other party." (Br. Supp. at 14.) *See also California Wine Ass'n v. Wisconsin Liquor Co. of Oshkosh*, 20 Wis.2d 110, 126, 121 N.W.2d 308, 317 (Wis. 1963) (holding that exclusive distributorship contract having no provisions concerning termination can be terminated after the giving of reasonable notice). Since its agreement with Kay did not have a termination provision, Energy Brands argues that the termination of Kay's distributorship does not constitute a breach of contract unless the notice provided was unreasonable. Kay makes no argument that the notice provided was unreasonable. It thus follows, Energy Brands contends, that the termination does not constitute a breach.

Kay does not dispute the principle of law upon which Energy Brands' argument rests. Instead, Kay has come forward with new evidence in an effort to show that the oral agreement

20

between the parties did in fact include a provision governing its termination. In response to Energy

Brands' motion for summary judgment, Kay submitted declarations of two of its employees,

General Manager Paul DeGrave and Non-Alcoholic Brands Manager Terry Schroth, who describe

in virtually identical terms their recollection of the oral discussions that took place with Energy

Brands representatives more than five years earlier. DeGrave states:

> Energy Brands' representatives used words to the effect that as long as Kay worked
> in good faith to reasonably increase sales and distribution, particularly in key
> accounts, that Kay would continue as Energy Brands' exclusive distributor in its
> territory.

(DeGrave Decl. ¶ 3, Doc. #49.)

Schroth's declaration is essentially the same:

> Energy Brands' representatives used words to the effect that, if Kay agreed to take
> on their brands, Kay would be the exclusive distributor as long as we worked in
> good faith to reasonably increase sales and distribution levels. They did not propose
> any specific numerical requirement for how fast sales and distribution had to
> increase. However, they did require that Kay agree to utilize their relatively unique
> marketing strategy and focus on what they perceived to be key accounts.

(Schroth Decl. ¶ 3, Doc. # 50.) Based on this evidence, Kay argues that the agreement provided that

Kay was entitled to continue as a distributor indefinitely and that the agreement could be terminated

only if Kay failed to work in good faith to reasonably increase sales and distribution. It therefore

follows, Kay contends, that a jury could find the agreement was not terminable at will and thus

summary judgment should be denied.

Energy Brands objects to Kay's attempt to change its version of the agreement at this stage

of the proceedings. It notes that Kay was expressly asked by interrogatory to describe in detail all

of the agreements with Energy Brands, including the terms of such agreements, that it claimed were

relevant to its claims. Nowhere in its four-page answer to the interrogatory did Kay mention that

21

the parties agree Kay could be terminated only for cause. (Aff. of Mollie J. Lucas, Ex. B.)

Moreover, when Thomas Kolocheski, Kay's president, was deposed, he testified that he could not

recall a discussion concerning termination:

> Q: Was there a specific discussion at any time before you agreed to become a Glacéau brand distributor about the circumstances under which either Kay Beer or Glacéau could terminate the relationship?
>
> A: I believe we were under the understanding that we could be terminated for nonperformance.
>
> Q: And was that subject discussed prior to your agreeing to become a distributor?
>
> A: I don't recall, but that would be standard in the industry for nonperformance.
>
> Q: So the understanding you just testified to about the circumstances under which either party could terminate, was that based upon a discussion with anybody at Glacéau?
>
> A: I don't recall.

(Defs.' Resp. to Kay's PFOF ¶ 2, Longley Decl. Ex. A, Kohlcheski Dep. at 75-76.) Under these

circumstances, Energy Brands contends that Kay should not be allowed to add "new" evidence in

response to a summary judgment motion. (Defs.' Reply Br. at 8.) On the other hand, even if the

declarations of DeGrave and Schroth are considered, Energy Brands contends that Kay's contract

nevertheless fails because the contract described by them is so indefinite as to be unenforceable.

"It is well established in this Circuit that, as a general rule, a party may not create an issue

of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn

testimony." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n.5 (7th Cir. 2008). Allowing a party to

defeat summary judgment by submitting affidavits that contradict previous sworn testimony would

defeat the very purpose of summary judgment. *Babrocky v. Jewel Food Co. & Retail Meatcutters*

22

*Union*, 773 F.2d 857, 861 (7th Cir.1985) ("Otherwise the very purpose of the summary judgment motion – to weed out unfounded claims, specious denials, and sham defenses – would be severely undercut."). But the "sham affidavit rule" applies to exclude newly offered evidence only when a clear contradiction exists that is otherwise unexplained. *Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2008). An inconsistent affidavit may prevent entry of summary judgment if the inconsistency is otherwise explained. *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir. 1985) ("An inconsistent affidavit may preclude summary judgment, however, if the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony or if the affiant lacked access to material facts and the affidavit sets forth the newly-discovered evidence."). This case does not call for application of the sham affidavit rule. Kay's failure to disclose the term of the agreement governing termination in its interrogatory answer is not the kind of clear and unexplained contradiction of previous sworn testimony that the sham affidavit rule was designed to address.[3]

Energy Brands' argument that the contract is too indefinite to be enforceable also fails. A promise to use good faith and to reasonably increase sales is sufficiently definite to support a contract. *Lambert Corp. v. Evans*, 575 F.2d 132, 138 (7th Cir. 1978). Indeed, the Uniform Commercial Code, as adopted in Wisconsin, addresses this very issue:

---

[3]This is not to say that the failure to mention this term does not raise questions of credibility, especially since Kay's answers to Energy Brands' interrogatories were apparently sworn to by DeGrave. But the failure to include a term of an oral contract when asked to describe it is not the same as a contradiction of sworn testimony. Moreover, the fact that Energy Brands previously paid Kay when it reduced its territory suggests that the agreement was not terminable at will. On the other hand, it could also be the case that Energy Brands paid Kay because at the time it wanted Kay to continue serving as a distributor of its products in the remaining territory. These are all matters for a jury to decide.

23

A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

Wis. Stat. § 402.106(2). Here, in addition to expressly agreeing to use good faith in selling Energy Brands' products, Kay contends the agreement called for it to reasonably increase sales. Under Wisconsin law, this would appear sufficient. *See Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1385-86 (7th Cir. 1995); *compare Pessin v. Fox Head Waukesha Corp.*, 282 Wis. 277, 282 N.W. 582 (1938) (holding that beer distributor contract failed where distributor had no obligation to sell beer he purchased).

Energy Brands' final challenge to Kay's contract claim is that the alleged agreement is void under the statute of frauds. Wisconsin's statute of frauds provides that "[e]very agreement that by its terms is not to be performed within one year from the making thereof" is void unless it is in writing. Wis. Stat. § 241.02(1)(a). Citing *Landess v. Borden*, Energy Brands contends that Wisconsin regards contracts for an indefinite duration as void under the statute of frauds.[4] But

---

[4]Kay contends that Defendants have waived the affirmative defense of statute of frauds under Fed. R. Civ. P. 8(c)(1). (Pl.'s Br. at 28) (citing *Roe v. Sears, Roebuck & Co.*, 132 F.2d 829, 832 (7th Cir. 1943)). As Kay did not provide the declarations alleging a discussion about termination for cause until it was responding to the motion for summary judgment, relief from the waiver of the affirmative defense is appropriate. The Court grants defendants leave to amend the answer to assert the statute of frauds as a defense. By submitting the information it did regarding the circumstances of the formation of the contract in 2002 at this stage, Kay has opened the door to the defendants to this affirmative defense. As the Seventh Circuit has noted,

The rule that forfeits an affirmative defense not pleaded in the answer (or by an earlier motion) is, we want to make clear, not to be applied rigidly. Often a change of circumstances will excuse a belated pleading of such a defense . . .

*Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1123 (7th Cir. 1998). Kay's submission of two declarations alleging discussions regarding termination for cause is a change of circumstances warranting the Court's allowing the defendants leave to amend.

24

*Landess* dealt with an implied contract that had no provision governing termination. The Court noted with respect to such contracts that "[c]ontracts for an indefinite duration are terminable at will . . . or they are void for failing to comply with the statute of frauds requirement that contracts that cannot be completely performed within one year must be reduced to writing." 667 F.2d at 631. Here, based on the evidence discussed above, a jury could conclude that the parties agreed that the distributorship could be terminated only for cause. *Landess* therefore does not control.

As to indefinite contracts that contain provisions governing termination, Wisconsin courts have held that the statute of frauds is inapplicable if termination could have occurred within one year. Thus, in *Nelsen v. Farmers Mut. Automobile Ins. Co.*, 4 Wis. 2d 36, 90 N.W.2d 123 (Wis. 1958), the Wisconsin Supreme Court held that an oral agency agreement under which an insurance company promised the agency that, in return for selling its policies and building up its business, the agency would be allowed to continue as its agent for as long it sold in the state, was not void under the statute of frauds. The Court determined that the contract was to continue until either the insurance company discontinued writing insurance policies in the state or the agency discontinued its operations there. Since either of these contingencies could conceivably have occurred within the first year, the Court concluded that the contract was not within the statute. 4 Wis. 2d at 52, 90 N.W.2d at 132.

In *Metropolitan Liquor Co., Inc. v. Heublein, Inc.*, 305 F. Supp. 946 (E.D. Wis. 1969), the Court followed the same rationale in rejecting a statute of frauds challenge to an oral distribution agreement similar to the agreement Kay claims existed here. In *Metropolitan Liquor*, the plaintiff alleged that the defendant promised that plaintiff's distributorship franchise for the defendant's wine would not be modified as long as plaintiff satisfactorily performed its obligations as a distributor

25

of that product. Although the oral agreement was indefinite and had allegedly been in existence for more than twenty years, Judge Gordon, relying on *Nelson*, rejected the defendant's claim that it was void under the statute of frauds, noting "[i]f the plaintiff had not satisfactorily performed its obligation as a distributor within the first year, the contract could have been ended." 305 F. Supp. at 950; *see also Joe Regueira v. American Distilling Company, Inc.*, 642 F.2d 826 (5th Cir. 1981) (holding that oral agreement between alcoholic beverage manufacturer and distributor which provided that it would continue until distributor's promotion or share of manufacturer's sales declined was not void under statute of frauds since agreement could have been lawfully terminated prior to expiration of one year). The same conclusion follows here. Energy Brands could have lawfully terminated the agreement in the first year if Kay had failed to use good faith in selling the Glacéau products or failed to reasonably increase sales. Thus, the contract could have been performed within one year. It therefore follows that under the Wisconsin court's construction of the statute of frauds, the oral agreement is not void.

## F. Unjust Enrichment

Defendants also seek summary judgment on Kay's claim for unjust enrichment. In order to recover on a claim for unjust enrichment, a plaintiff must establish "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value." *Puttkammer v. Minth*, 83 Wis. 2d 686, 689, 266 N.W. 2d 361 (Wis. 1978). Kay claims it conferred a benefit on Energy Brands by promoting and distributing its products, increasing sales, and building the Glacéau brand's value, which Energy Brands was ultimately able to sell to Coke for $4 billion.

(Pl.'s Br. in Opp. at 34.) Kay also asserts that its efforts benefitted Cadbury and, as a result, Cadbury was payed a penalty of more than $93 million when its distributorship was terminated. (*Id.*) Kay contends that to allow the defendants to terminate its distributorship without compensating it for the benefit it has conferred on them would be unjust.

Kay's unjust enrichment claim against Energy Brands falters, however, because these parties elected to govern their relationship by contract. Under Wisconsin law, unjust enrichment is an obligation enforced in the absence of any agreement. *Beer Capitol Distrib., Inc. v. Guinness Bass Import Co.*, 290 F.3d 877, 881 (7th Cir. 2002) ("unjust enrichment is an obligation enforced in the absence of any agreement") (citing *Puttkammer v. Minth*, 83 Wis. 2d 686). Having agreed to the specific terms of a contract, a party cannot seek to improve its position by appealing to equity when, as a result of subsequent events, it appears that the other party to the agreement benefitted more than either may have expected.[5]

Kay argues, however, that the rule that a contract bars an unjust enrichment claim does not apply when the very existence of a contract is in dispute. Since the defendants deny that Kay was party to a contract with Energy Brands, at least after the Release was signed in 2005, Kay contends that its unjust enrichment claim should proceed as an alternative to its contract claim against Energy Brands. Kay also notes that a claim for equitable relief may exist even if there was a contract between the parties, if the benefit conferred falls outside the scope of the contractual relationship. *Northern Crossarm Co., Inc. v. Chemical Specialties, Inc.*, 318 F. Supp. 2d 752, 766 (W.D. Wis.

---

[5]To the extent Kay's complaint is intended to state a claim for promissory estoppel, it fails for the same reason. "[T]he promissory estoppel theory applies only when no contract exists, oral or otherwise, or the contract fails to address the essential elements of the parties' total business relationship." *Spensley Feeds, Inc. v. Livingston Feed & Lumber, Inc.*, 128 Wis. 2d 279, 291 n.8, 381 N.W.2d 601, 607 (Ct. App. 1985).

27

2004); *see also Kramer v. Alpine Valley Resorts, Inc.*, 108 Wis.2d 417, 421-22, 321 N.W.2d 293, 295 (Wis. 1982) ("In situations where the contract fails to embody essential elements of the total business relationship of the parties, we conclude that the existence of a contract does not bar recovery under promissory estoppel.*"*). In this case, Kay contends, the benefit it conferred on Cadbury fell outside the series of sales contracts the parties entered into. (Kay Opp. Br. at 32-33.)

The Court concludes that Kay's unjust enrichment claim is barred by its contractual relationships with the defendants, and by the fact that it has failed to offer evidence of a benefit it conferred on the defendants that they have unjustly retained. Kay purchased Glacéau products for resale, first from Energy Brands, and then from Cadbury. Kay's own evidence reveals that it received profits from its resale of the Glacéau products. If Kay thought the profits it received from its sales of Glacéau products did not amount to fair compensation for its efforts, or that the benefit it conferred on Energy Brands and/or Cadbury as a result of its efforts was worth more to them than it received in return, it could have attempted to negotiate a more advantageous arrangement. Having failed to do so, Kay may not now appeal to equity to create a contract it did not seek or was unable to obtain on its own.

Even aside from its contractual relations with the defendants, Kay's unjust enrichment claim fails because Kay cannot show that it conferred a benefit upon the defendants that it would be unjust for them to retain. This is not to say that at least Energy Brands did not benefit from Kay's efforts to sell its products in northeast Wisconsin. Every company that manufactures or produces a consumer product benefits from sales of its product by distributors or retail outlets. But the distributor or retailer also benefits from its sales; indeed, the greater the sales, the greater the benefit to both parties. Thus, it was clearly in Kay's own interest to promote the products it was attempting

28

to sell. "Courts will not find unjust enrichment where plaintiff has rendered services to advance his own interest." *Norris Sales Co., Inc. v. Target Div. of Diamant Boart, Inc.*, 2002 WL 31771169, *4 (E.D. Pa. Dec. 11, 2002); *see also King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 158 F. Supp. 2d 463, 467 (E.D. Pa. 2001) (noting "unjust enrichment will not be found where Plaintiff rendered services to advance its own interest").

Further, as the above discussion of Kay's claim under the WFDL shows, Kay has failed to demonstrate that it invested the amount of time, money or other resources in the Glacéau product line needed to create the "community of interest" Wisconsin law requires in order to limit the right of a grantor to terminate a dealership. A person advancing a claim for unjust enrichment is "seeking the return of money actually expended . . . ." *In re Lade's Estate*, 82 Wis. 2d 80, 85, 260 N.W.2d 665, 668 (Wis. 1978). Kay has failed to demonstrate that it expended any more time, money or effort to market Energy Brands' products than it did to market any of the 65 other beverage lines that it represented.

In support of its unjust enrichment claim, Kay focuses on the fact that Energy Brands was paid more than $4 billion by Coke for its Glacéau product line and that Cadbury was paid $93 million upon termination of its distribution agreement. Indeed, Kay insists it needs further discovery concerning these amounts in order to show that the proceeds are traceable to its work. (Kay Opp. Br. at 34.) The assumption underlying Kay's claim is that since Energy Brands received $4 billion for the Glacéau line of products and Cadbury received $93 million upon termination of its right to distribute Glacéau products, it is unfair for Kay not to receive a portion of the proceeds of the sale of the product line since it also served as a distributor. But Cadbury had a written contract with Energy Brands under which Cadbury was entitled to a termination penalty based on

29

a formula set forth in the agreement.  (Perez. Aff., Ex. C.)  Presumably, the termination provision, like the rest of the contract, was the product of negotiations between the parties in which each made certain promises and assumed certain obligations in return for reciprocal promises made and obligations assumed by the other.  In essence, Kay seems to want the Court to evaluate the arrangement Energy Brands had with Cadbury in order to arrive at an appropriate termination penalty for Energy Brands to pay Kay.  But it is not the role of a court to create contractual rights where none exist.

Kay's claim that Energy Brands obtained a benefit by promoting and distributing the products, and increasing sales and building the value of the brand are just the sort of activities expected of a distributor performing under a distribution contract.  Because these activities are within the scope of the contractual relationship, Energy Brands is entitled to summary judgment on Kay's claim of unjust enrichment.  *Beer Capitol*, 290 F.3d at 881.  As to Kay's unjust enrichment claim against Cadbury, Kay was already paid for the loss of the portion of its territory that Cadbury was granted.  Under the terms of the Release, Kay relinquished all claims it had arising out of the transfer to Cadbury, and it may not seek to resurrect them under the guise of a claim for unjust enrichment.  Accordingly, the defendants' motion for summary judgment on Kay's unjust enrichment claim will be granted.

## G.  Breach of Fiduciary Duty

Kay has also asserted a claim against the defendants for breach of fiduciary duty.  Kay alleges that the defendants owed it a fiduciary duty under a theory that the parties entered into a joint venture and that the defendants breached that duty by failing to promote the venture and avoid

30

conduct detrimental to Kay's interest. (Am. Compl. ¶¶ 34-35.) The defendants deny that they entered into a joint venture with Kay or that there existed a fiduciary relationship between them.

In order to establish a joint venture in Wisconsin, it must be shown that there is: "(1) contribution of money or services by each of the parties; (2) joint proprietorship and mutual control over the subject matter of the venture; (3) an agreement to share profits; and (4) an express or implied contract establishing the relationship." *Ruppa v. Am. States Ins. Co.*, 91 Wis.2d 628, 645, 284 N.W.2d 318, 325 (Wis. 1979) (citation omitted). The absence of any one of the elements is sufficient to establish as a matter of law that no joint venture exists. *Bach v. Liberty Mut. Fire Ins. Co.*, 36 Wis. 2d 72, 80, 152 N.W.2d 911 (1967).

Here, Kay has produced no evidence that the parties exercised joint proprietorship or mutual control over the sale and distribution of the Glacéau brands, or that they agree to share profits. Kay cites a undetermined number of promotional events the costs of which were shared by the parties, but it offers no evidence to refute the defendants' assertion that, in general, once Kay purchased product from the defendants, Kay determined how to store the product, how to price it for various customers, how to market and deliver it, and how to bill and collect from its customers. Kay also made its own decisions relating to staffing its business and expenses relating to its operation. And there is no suggestion that the parties agreed to share profits.[6]

---

[6]Kay claims that "the profits and losses for the parties' joint efforts were allocated through the parties' agreement for reimbursement of the actual costs of the promotions and impliedly inured to their respective benefits through the increased sales that could be expected to benefit each party as a result of the marketing strategies, incentive programs and promotional events." (Pl.'s Br. in Opp. at 36-37.) Kay has not pointed to anything in the record supporting a finding that it actually agreed to share profits with defendants.

Moreover, as the defendants point out, courts in other jurisdictions have repeatedly rejected the notion that a typical supplier-distributor arrangement creates a fiduciary relationship as a matter of law. *See Aerospace Am. Inc. v. Abatement Techs., Inc.*, 738 F. Supp. 1061, 1071 (E.D. Mich. 1990) ("Courts have repeatedly rejected the proposition that a fiduciary relationship or obligation exists between a manufacturer and a distributor of its products."); *OKI Distrib., Inc. v. Amana Refrigeration, Inc.*, 850 F. Supp. 637, 647 (S.D. Ohio 1994) ("[I]it is well established that a manufacturer-distributor relationship, absent more, does not give rise to a fiduciary relationship."); *C. Pappas Co., Inc. v. E.& J. Gallo Winery*, 610 F. Supp. 662, 667 (E.D. Cal. 1985) ("Clearly, the relationship of manufacturer/distributor cannot ordinarily meet th[e] test" for fiduciary relationship.).[7] Finally, the absence of the kind of evidence needed to establish a "community of interests" for purposes of the WFDL claim also suggests the relationship fell far short of what is needed to give rise to a fiduciary relationship. Summary judgment will therefore be granted on Kay's claim for breach of fiduciary relationship.

## H. Violation of Wis. Stat. § 134.01

Defendants also move for summary judgment on Kay's claim that they conspired together to injure Kay in its business in violation of Wis. Stat. § 134.01, which reads:

> Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his

---

[7]Kay cites *Milton Abeles, Inc. v. Creekstone Farms Premium Beef*, LLC, 2007 WL 1434990 at *3-4 & n.3 (E.D. N.Y. 2007), for the proposition that other courts have applying the same criteria have upheld claims of joint venture in the distributorship context. (Opp. Br. at 35.) But *Milton Abeles* addressed the issue on a Rule 12(b)(6) motion to dismiss at the pleading stage. This case is before me on summary judgment and, thus, more than bare allegations affording the opposing party notice of the claim is required.

or her reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his or her will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

Wis. Stat. § 134.01 (2008).

Read literally, the statute would seem to outlaw much, if not most, comparative advertising and marketplace competition. Businesses are constantly joining together, formally or informally, in an effort to increase the number of their own customers and, as a result, decrease the customers of their competition, thereby causing injury to the business of their competitors. That is precisely what goes on in a free market. Justice Holmes observed with respect to the same statute more than 100 years ago:

If it should be construed literally, the word 'wilfully' would embrace all injuries intended to follow from the parties' acts, although they were intended only as the necessary means to ulterior gain for the parties themselves. Taken in that way the word would hit making a new partnership, if it was intended thereby to hurt someone's else business by competition.

*Aikens v. Wisconsin*, 195 U.S. 194, 202-203 (1904). Justice Holmes noted, however, that the Wisconsin Supreme Court had adopted a narrower construction of the statute by ignoring the disjunctive "or" and requiring that the injury be both willful and malicious. Under this interpretation, malicious injuring means "doing a harm malevolently, for the sake of the harm as an end in itself, not merely as a means to some further end legitimately desired." *Id.* at 203. The result is a statute that prohibits persons from combining together and acting in concert for the purpose of taking business from a competitor by any means whatever, lawful or unlawful, when their motive is solely to do harm to the competitor. In other words, the statute subjects persons to criminal and

33

civil liability, even when acting in a lawful manner, if their motive is improper; a sort of "hate crime" for businesses without the crime. There is not even a requirement that the underlying conduct be actionable under the civil law. *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 162 Wis.2d 73, 92, 469 N.W.2d 629 (1991) (noting "this state has rejected the rule that, for a cause of action for conspiracy to lie, there must be underlying conduct which would in itself be actionable").

Wisconsin courts have limited the otherwise overly broad reach of the statute by emphasizing the element of malice. Thus, the Wisconsin Supreme Court has stated that the malice required to prove a claim under § 134.01 is more than an intent to do harm. *Brew City Redevelopment Group v. Ferchill Group*, 2006 WI 128, ¶17, 297 Wis.2d 606, 724 N.W.2d 879. What is required is an intent to do "wrongful" harm. "Such harm does not include incidental harms that derive from a person's seeking competitive advantage. It requires inflicting a harm 'for the sake of harm as an end in itself, and not merely as a means to some further end legitimately desired [such as hurting someone else's business by competition].'" *Id.* at ¶ 23 n.7 (quoting *Malecki*, 162 Wis. 2d at 88). "For conduct to be malicious under conspiracy law it must be conduct intended to cause harm for harm's sake." *Maleki*, 162 Wis.2d at 86, 469 N.W.2d at 634.

Kay offers as evidence of such malice on the part of Energy Brands and Cadbury the fact that they went ahead with the termination in the face of correspondence from Kay's attorney warning them not to violate Kay's rights, the fact Kay has received none of the $200 million allocated for liabilities arising out of the termination of existing distribution agreements whereas Cadbury has received $93 million, and the fact that the defendants have worked together to falsely deny the existence of a direct relationship and agreement with Kay. Kay also complains that the

defendants have blocked discovery directed to determine their motivation for terminating its distribution agreement. (Pl.'s Br. in Opp. at 38.)

Kay's evidence does not even suggest the kind of malice required under § 134.01. Once Energy Brands sold its interest in the Glacéau brands to Coke, both it and Cadbury lost any ability to continue selling the product to Kay. Kay's suggestion that Energy Brands elected to undertake such a sale not for the $4 billion it received from Coke, but solely to harm Kay, is patently absurd. And of course, once Energy Brands followed through on the sale, Cadbury lost its right to distribute Glacéau products and was unable to sell to Kay regardless of its own desires. There is no reason to believe that Cadbury had anything to do with Energy Brand's decision to sell the product line to Coke.

The fact that Energy Brands elected not to share the proceeds of the sales with Kay and the manner in which the defendants have conducted their defense against Kay's lawsuit also fall far short of suggesting a desire to cause injury to Kay out of sheer malice. Given the absence of a dealership within the meaning of the WFDL, and the ill-defined terms of an oral agreement, subsequently narrowed if not extinguished by a release executed by the parties, and later supplemented at the last minute in response to the defendants' motion for summary judgment, the defendants' response to Kay's demands that it share in the proceeds of Energy Brands' sale of the Glacéau product line to Coke evidences no malice to Kay. A company's refusal to pay money to a party whom it believes in good faith it has no legal obligation to pay is not evidence of malice. The suggestion that Kay should be allowed to continue its blitzkrieg of discovery requests in an effort to unearth some scintilla of evidence of ill will toward it by some employee of one of the

35

defendants would only lead to the further waste of resources. Summary judgment will therefore be granted on Kay's claim for civil conspiracy.

## CONCLUSION

For the reasons stated above, Kay's motions to stay consideration of the defendants' motion for summary judgment and to compel discovery are denied. The defendants' motion for a protective order is granted, as is the defendants' motion for summary judgment as to all claims with the exception of Kay's claim for breach of contract against defendant Energy Brands. All other defendants are dismissed. The Clerk is directed to place this matter on the Court's calendar within the next ten days for further scheduling.

**SO ORDERED** this __20th__ day of February, 2009.


s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

36