# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KAY BEER DISTRIBUTING, INC.,

      Plaintiff,

    v.                                Case No. 07-C-1068

ENERGY BRANDS, INC.,

      Defendant.

## ORDER ON RECONSIDERATION OF THE
## EFFECT OF THE RELEASE

In the Court's Decision and Order partially granting Energy's motion for summary judgment (Doc. # 77), the Court considered the meaning and effect of the Agreement and General Release ("the Release") entered into between Kay and Energy on April 4, 2005. Energy asserted in its summary judgment papers that the Release bars all of Kay's claims against Energy Brands as of its effective date. By its terms, the agreement states that "the distribution relationship by and between Energy Brands Inc. ("EBI") and Kay is terminated as of the date hereof." (Doc. # 27, Aff. of Michael Perez, Ex. A.) Based on extrinsic evidence of the intentions of the parties, Kay took the position that the Release only terminated the distributorship in the Outagamie County portion of its territory. Although the Court rejected Energy's contention at the time, upon further consideration of the matter in preparation for trial I have concluded that my earlier decision was in error.

In rejecting Energy's contention, the Court applied New York law, which the parties do not dispute governs the Release, and concluded that New York courts had adopted a more liberal view of the parole evidence rule as it relates to general releases. (Doc. # 77 at 15.) The Court came to

this conclusion after noting various authorities interpreting New York law on the matter. *Mangini v. McClurg*, 249 N.E.2d 386, 389 (N.Y. 1969) ("It is true that a general release is governed by principles of contract law. There is little doubt, however, that its interpretation and limitation by the parole evidence rule are subject to special rules."); *Meil v. Syracuse Constructors, Inc.*, 247 N.Y.S.2d 541, 543 (N.Y. Sup. Ct. 1964) ("It is a well settled rule in this state that the language of a release must yield to the intention of the parties and in reference to the circumstances surrounding the situation.") (citation omitted); *Cordaro v. Lusardi*, 354 F. Supp. 1147, 1050 (S.D.N.Y. 1973) (claiming that New York has adopted the "liberal view" on the question of whether language in the release is conclusive or whether parol evidence is available to explain what the parties intended regarding the scope of a release and that "[a] general release does not always mean what it seems to say."). I relied in part on language from the 1973 district court case, *Cordaro*, to support my conclusion that "Under New York law, extrinsic evidence may be considered to clarify the scope of a general release." (Doc. # 77 at 15.)

Upon further consideration, however, I am no longer convinced that New York law would permit Kay to introduce extrinsic evidence to clarify the scope of the Release. The most recent authorities do not provide comfort to the position Kay advances, as they apply the parol evidence rule to releases in the same manner as contracts generally, requiring that before extrinsic evidence can be admitted the court must first determine as a matter of law that the release is ambiguous. *See, e.g., Broyhill Furniture Industries, Inc. v. Hudson Furniture Galleries, LLC*, 61 A.D.3d 554, 555, 877 N.Y.S.2d 72, 74 (N.Y. App. Div. 2009); *Northgate Elec. Corp. v. Barr & Barr, Inc.*, 61 A.D.3d 467, 468, 877 N.Y.S.2d 36, 37 (N.Y. App. Div. 2009) ("Given the clarity of the release, the motion court should not have considered the affidavit of plaintiff's principal asserting his intention to release only the change order requests submitted to the mediator, and that he signed the release

2

without reading it or fully comprehending its significance, and without representation of counsel.")
(citations omitted); *Art Finance Partners, LLC v. Christie's Inc.*, 58 A.D.3d 469, 470, 870 N.Y.S.2d
331, 332-33 (N.Y. App. Div. 2009) ("The mutual releases were not 'clear and unambiguous as to
the intention of the parties to cover the amount in dispute'. Thus, as to the scope of the releases,
'reference to parol evidence to discern the intentions of the parties [was] appropriate.'") (citations
omitted); *Harris v. Hallberg*, 36 A.D.3d 857, 859, 828 N.Y.S.2d 579, 582 (N.Y. App. Div. 2007)
("Contrary to the plaintiffs' contention, evidence of the alleged oral agreement, which would
contradict and vary the terms of the release, is precluded by the parol evidence rule.") (citations
omitted).

> The Second Circuit provided the following statement on the matter:
>
> Under New York law, general releases are governed by principles of contract law,
> *Mangini v. McClurg*, 24 N.Y.2d 556, 562, 249 N.E.2d 386, 389, 301 N.Y.S.2d 508,
> 512 (1969), and "[t]he parol evidence rule forbids proof of an oral agreement that
> might add to or vary the terms of a written contract that was intended to embody the
> entire agreement between the parties," *Stage Club Corp. v. West Realty Co.*, 212
> A.D.2d 458, 459, 622 N.Y.S.2d 948, 950 (1st Dep't 1995) (citing *Fogelson v.
> Rackfay Constr. Corp.*, 300 N.Y. 334, 90 N.E.2d 881 (1950)). The question of
> whether the language of a contract is ambiguous is considered a question of law,
> *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir.1992); we
> therefore review the district court's determination of this issue de novo.

*Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669, 672 (2d Cir. 1997). The appellate court
disagreed with the district court's conclusion that the release at issue was unambiguous, but nothing
in the decision suggests that the Second Circuit disagreed with the lower court's discussion of New
York law on the matter, which was based on its conclusion that "[a] close reading of the case law
thus establishes that under New York state law where there is no ambiguity and the facts do not fall
within one of the categories which provide an exemption from the parol evidence rule, the intent

3

of the parties as to the scope of the release must be derived from the language of the release itself."

*Id*. (quoting *Albany Sav. Bank, FSB v. Halpin*, 918 F. Supp. 553, 560 (N.Y.N.D. 1996), *vacated*, 117 F.3d 669 (2d Cir. 1997)).

Recent decisions of the New York courts–and the federal courts interpreting New York law in the thirty-plus years since *Cordaro* declared that New York had adopted a "liberal view" regarding the availability of extrinsic evidence to explain the scope of a release–do not support *Cordaro*'s discussion of the issue. Because New York law only appears to permit the introduction of extrinsic evidence where the release is ambiguous, and the Release in this case is not ambiguous, Kay will not be permitted to introduce extrinsic evidence to alter the terms of the Release.

### Kay's Assertion that the Release was Procured by Misrepresentation

Kay also argued in response to Energy's contention that the Release terminated the distributorship in its entirety that it was fraudulently induced into executing the release based upon Energy's misrepresentations regarding the scope of the document. According to this theory, the misrepresentation by Energy was in its sending a cover page explaining that the Release was per the discussions between Terry Schroth and Mike Perez, which Kay contends contemplated only a termination of part of Kay's territory. In opposing Energy's motion for summary judgment, Kay quotes language from a 1931 decision of the Wisconsin Supreme Court: "A release may be set aside 'if the person signing it has been induced to sign it by misrepresentation of the other party as to its contents, it may be avoided for fraud and mistake, if the misrepresentation was intentional, or for mistake, if it was not intentional.'" (Br. in Opp. at 19) (quoting *Lefebvre v. Nickolai*, 205 Wis. 115, 236 N.W. 684, 686 (Wis. 1931)). In *Lefebvre,* the insured claimed that the insurance company's agent told him the paper he was presented to sign with the words "Lost Policy Receipt" in large and

4

bold type was merely a receipt for a lost insurance policy, when in fact it contained contractual terms cancelling the policy. The court affirmed the judgment of the trial court, which was based upon the jury's finding that the insured had signed the receipt without knowledge that it cancelled his policy and that both the insured and the insurance agent made a mutual mistake, as neither intended to cancel the policy.

The facts here, however, are significantly different than those in *Lefebvre*. Kay is not an unsophisticated party as the insured of "limited mentality" in *Lefebvre*. Further, the heading of one-page, two-paragraph release, "AGREEMENT AND GENERAL RELEASE," unlike the heading in *Lefebvre*, alerts the reader that the document is a release. (Perez Aff. Ex. A.) Of course, Kay's argument is not that it did not know the document was a release, but only that it thought the scope was more limited than what the document itself said, that "the distribution relationship by and between Energy . . . and Kay is terminated," based upon its prior discussions with Energy. (*Id*.)

In essence, Kay asks to be excused from its obligation to read the Release before executing it based upon the cover page referencing prior discussions between the parties. But the Wisconsin Supreme Court has noted that failure to read a contract is insufficient reason to excuse one from their contractual obligations:

> Failure to read a contract, particularly in a commercial contract setting, is not an excuse that relieves a person from the obligations of the contract. "Men, in their dealings with each other, cannot close their eyes to the means of knowledge equally accessible to themselves and those with whom they deal, and then ask courts to relieve them from the consequences of their lack of vigilance." *Nauga, Inc. v. Westel Milwaukee Co., Inc.*, 216 Wis. 2d 306, 314-15, 576 N.W.2d 573 (Ct. App. 1998) (quoting this court's decision in *Carney-Rutter Agency v. Central Office Bldgs.*, 263 Wis. 244, 252-253, 57 N.W.2d 348 (1953)).

*Deminsky v. Arlington Plastics Machinery*, 2003 WI 15, ¶ 30, 259 Wis. 2d 587, ¶ 30, 657 N.W.2d 411, ¶ 30. The teaching of *Deminsky* is clear–to the extent Kay, a sophisticated party in a

5

commercial setting, opted to rely on previous discussions regarding the terms of the Release instead

of actually read the two-paragraph document before executing it, it cannot now claim it should be

relieved from the terms of the agreement.

## Kay's Claim Energy had a Duty to Disclose

Kay also argued that Energy failed to disclose the fact that it was obligated to reveal, namely

that it had entered into a distribution agreement with Cadbury and that it planned to provide

Cadbury termination revenues from Kay's territory in the future. In support of this contention, Kay

cites *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205,

regarding the obligation to disclose a fact in the context of a business transaction. The court in

*Kaloti* held that a party to a business transaction has a duty to disclose a fact where:

> (1) the fact is material to the transaction; (2) the party with knowledge of that fact
> knows that the other party is about to enter into the transaction under a mistake as
> to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one
> party, and the mistaken party could not reasonably be expected to discover it; and
> (4) on account of the objective circumstances, the mistaken party would reasonably
> expect disclosure of the fact.

2005 WI 111, ¶ 20. The *Kaloti* court found that the plaintiff food wholesaler stated a claim for

intentional misrepresentation against a cereal company where the cereal company solicited orders

from the wholesaler and failed to disclose that it intended to sell its products directly to large stores

the wholesaler had previously serviced. The wholesaler alleged that it would not have ordered the

products it did had it known that the cereal company was planning to sell directly to the stores with

which it had done business. Kay's argument that Energy had an obligation to disclose to Kay the

fact it had dealings with Cadbury fails, as Energy's future plans to put to use the distribution rights

6

that it sought to have Kay surrender by contract is not a fact that Kay would have reasonably expected to be disclosed prior to agreeing to a termination of the distributorship.

Kay also appears to argue that if Energy intended to use the Release as encompassing the parties' entire relationship, instead of just a portion of Kay's territory as it allegedly represented, Energy's intent is a material fact it should have disclosed. This argument fails because notwithstanding whatever discussions were made prior to the execution of the Release, Energy did in fact disclose its intent regarding the scope of the Release in the document itself, which clearly stated that the "distribution relationship" was terminated.

## CONCLUSION

For the reasons stated above, I now hold as a matter of law that the Release entered into between the parties terminated the initial distribution agreement. Accordingly, extrinsic evidence will not be admitted for the purpose of altering the effect of the Release. I also find unconvincing Kay's argument that it was induced to execute the Release by fraud on the part of Energy, as well as its argument that Energy had a duty to disclose its future plans regarding the distribution of the product. While I conclude that extrinsic evidence will not be available at trial to explain the intent of the parties in entering into the Release, nothing will prevent Kay from putting forward evidence that even if the Release terminated the distributorship relationship in its entirety, a new agreement between it and Energy arose after the Release.

**SO ORDERED** this ___29th___ day of September, 2009.

s/William C. Griesbach
WILLIAM C. GRIESBACH
United States District Judge